**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**TIMOTHY KIDD,**

     **Plaintiff,**

**vs.**                                                           **CIVIL ACTION NO. 1:19-CV-00603**

**ANDREW SAUL,**
**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social

Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II

and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C.

§§ 401-433, 1381-1383f. By Order entered August 21, 2019 (ECF No. 3), this case was referred

to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to

submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. §

636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the

Pleadings and supporting Memorandum and Defendant's Brief in Support of Defendant's

Decision. (ECF Nos. 13, 14, 17)

Having fully considered the record and the arguments of the parties, the undersigned

respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for

judgment on the pleadings (ECF No. 13), **GRANT** Defendant's request to affirm the decision of

the Commissioner (ECF No. 17); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Timothy Kidd (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on August 5, 2015 alleging that his disability began on April 1, 2015 because of "back problems, leg problems, shoulder problems, hard of hearing in ears, ringing in ears, arm pain, hand problems, depression, panic attacks, do not like large crowds, limited reading, writing & spelling, prior hernia problems, restless leg syndrome, cannot sleep, and dyslexia".[1] (Tr. at 259, 263) His claims were initially denied on January 21, 2016 (Tr. at 117-121, 122-126) and again on April 13, 2016 upon reconsideration (Tr. at 133-139, 140-146). Thereafter, Claimant filed a written request for hearing on May 12, 2016. (Tr. at 147-148)

An administrative hearing was held on March 2, 2018 before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 36-62) On April 19, 2018, the ALJ entered an unfavorable decision. (Tr. at 18-35) On May 11, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 223) The ALJ's decision became the final decision of the Commissioner on July 17, 2019 when the Appeals Council denied Claimant's Request. (Tr. at 1-12)

On August 20, 2019, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter

---

[1] In his Disability Report submitted after the initial level of review, Claimant alleged that his mental impairments had deteriorated to the extent that he lost thirty pounds, has worse depression and anxiety and insomnia. (Tr. at 278) In a subsequent Disability Report submitted after the reconsideration level of review, Claimant again alleged that he is "more stressed out" and that his depression is worse. (Tr. at 292)

referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and Memorandum in Support of same (ECF No. 13, 14); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 17)

## Claimant's Background

Claimant was 50 years old as of the alleged onset date and considered a "person closely approaching advanced age" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(d), 416.963(d). (Tr. at 29) Claimant has a limited education, attended special education classes, and subsequently completed training in gunsmithing. (Tr. at 30, 264-265) He worked for over fifteen years as a merchandise displayer for Lowe's, a composite job, categorized as medium work, but as performed, heavy to very heavy. (Tr. at 265, 56-57)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2020. (Tr. at 23, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of April 1, 2015. (Id., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: residuals of a fracture of the right clavicle and crush injury of the right knee. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 24, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work with the following restrictions:

He can lift and carry 20 pounds occasionally and 10 pounds frequently. He can stand and walk for 4 hours in an 8-hour day, and he can sit for at least 6 hours in an 8-hour day. He cannot push or pull with the upper extremities. He cannot use foot controls with the right lower extremity. He can occasionally climb ramps and stairs; but can never climb ladders, ropes, or scaffolds. He can occasionally balance and stoop; but can never kneel, crouch, or crawl. He should never reach overhead. He can tolerate occasional exposure to extreme temperatures, vibrations, and hazards. He retains the capacity to understand, remember, and carry out simple, routine, and repetitive tasks. He can respond appropriately to occasional interactions with coworkers and supervisors where there is no teamwork, no over the shoulder supervision, and no interaction with the generally public. Work activity should not involve fast-paced production requirements and should involve few, if any, work related decisions. He can make an adjustment to usual work situations and occasional changes in the routines work setting.

(Tr. at 26, Finding No. 5)

At step four, the ALJ found Claimant was unable to perform his past relevant work. (Tr. at 29, Finding No. 6) In addition to his age, education, work history, RFC and noting that the transferability of job skills was immaterial, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 29-30, Findings Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from April 1, 2015 through the date of the decision. (Tr. at 31, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ erred on numerous grounds: that the ALJ erred because she did not find Claimant had severe mental impairments at step two, an error recognized by the Appeals Council because it determined Claimant had severe mental impairments; that the ALJ provided no analysis in her credibility determination; that the ALJ failed to evaluate the opinion evidence under the factors espoused by the Regulations, specifically with regard to the psychological evaluation report provided by L. Andrew Steward, Ph.D., without sufficient

explanation for her conclusions, resulting in the ALJ's substituting her own inexpert opinion; that the resulting RFC assessment was flawed; and finally, the ALJ did not consider Claimant's cane use, which would have precluded sedentary work. (ECF No. 14)

Claimant asks this Court to reverse the decision below for an award of benefits, or alternatively, remand this case to correct the errors below. (Id.)

In response, the Commissioner argues that the ALJ complied with the Regulations and conducted the proper analysis of Claimant's alleged subjective symptoms with the evidence of record; the ALJ's finding Claimant's alleged mental impairments non-severe is also supported by substantial evidence, appropriately finding the effects of same did not significantly limit his ability to engage in basic work activities; the ALJ properly evaluated the opinion evidence, and provided a good explanation for her rejection of Dr. Steward's opinion; and the resulting RFC is based on the record as a whole, and there was no evidence Claimant's cane was medically necessary, thus the ALJ appropriately excluded its use from the RFC assessment. The Commissioner states the final decision is based on substantial evidence and asks this Court to affirm. (ECF No. 17)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Claimant's Statements Related to His Activities, Treatment, and Functioning:

During an October 2015 telephone call with a state agency employee, Claimant reported that he had shoulder pain, back pain, and leg problems. (Tr. at 66) He stated he did not like crowds,

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

but he had no specialized treatment for mental impairments and was not currently taking any medications. (Id.) He stated he could drive and perform some household chores and needed no assistance bathing or dressing himself. (Id.) He shopped in various grocery stores, convenience stores, and Walmart. (Id.)

Evidence Related to Physical Impairments:

Although Claimant alleged he underwent right knee surgery for a remote crush injury (approximately 1989) and fractured his collarbone "years ago" (Tr. at 334, 336, 349-350), there are no medical records in the transcript until April 2014. At that time, Claimant presented to Community Health Center for treatment of a sexually transmitted disease. (Tr. at 336) He called Community Health Center in January 2015 for a medication refill (Tr. at 334), but never returned for any further treatment of any impairment after his initial appointment.

In October 2015, Claimant underwent right knee x-rays that showed mild narrowing and degenerative spurring along the patellar femoral joint with no evidence of effusion or visible soft tissue swelling. (Tr. at 339)

A consultative examination was performed on December 30, 2015 by Deirdre Parsley, D.O. (Tr. at 349-355) At that time, Claimant's complaints included back, leg, shoulder, arm, and hand/wrist pain; hearing loss; and restless leg syndrome. (Tr. at 349) Although he rated his pain at 9 to 10 on a 10-point scale, he had not been prescribed any medication, participated in any physical therapy or chiropractic treatment, or undergone surgery. (Id.) Dr. Parsley observed that Claimant ambulated with a cane, but he could stand and walk in the examination room without one. (Tr. at 351)

Dr. Parsley noted Claimant exhibited a good recent and remote memory; a euthymic mood and a congruent affect; appropriate thought content; and good general overall knowledge. (Id.) Dr. Parley also noted Claimant had right shoulder crepitus and a right clavicle deformity, but no joint redness, warmth, or swelling. (Tr. at 352) He had normal joint range of motion, had no atrophy, and could make a fist. (Id.) Although his cervical spine was tender, his legs were not tender, red, warm, or swollen. (Tr. at 352-353) Neurologically, Claimant had intact cranial nerves; 4/5 muscle strength in the shoulders, elbows, hips, left knee, ankles, and feet; 3/5 strength in the right knee; 5/5 grip strength; and decreased sensation in the right lower extremity. (Tr. at 353)

Dr. Parsley felt Claimant's reported symptoms and their functional effects seemed consistent with his statements, medical history, and some of the objective findings. (Tr. at 354) In a medical source statement, Dr. Parsley opined that Claimant could sit for 6 hours; stand/walk for 4 hours; lift and carry up to 10 pounds frequently and 25 pounds occasionally; bend and stoop occasionally; never squat, crouch, crawl, or kneel; frequently reach, handle, feel, grasp, and grip; and never climb ladders and scaffolds or be exposed to unprotected heights or loud noises. (Id.)

In January 2016, state agency physician Gene Godwin, M.D., reviewed Claimant's records and opined that he could perform a reduced range of light work with postural, manipulative, and environmental limitations due to his spine disorder, use of a cane, and joint dysfunction. (Tr. at 70-72)

In March 2016, Claimant presented to Ashly Hardin, D.O., as a new patient to establish primary care. (Tr. at 369) His chief complaints included neck, shoulder, and back pain, and numbness and tingling in his lower extremities. (Id.) Dr. Hardin's examination revealed limited shoulder range of motion, an irregular gait, ambulation with a cane, intact sensation and

10

coordination, and no extremity edema. (Tr. at 370) Dr. Hardin recommended ibuprofen for pain. (Tr. at 371) During a May 2016 appointment, Dr. Hardin observed Claimant had reduced shoulder range of motion and ambulated with a cane, but he was in no acute distress; had grossly intact sensation; and had normal coordination. (Tr. at 374) Dr. Hardin also observed Claimant had good insight and judgment; had a normal mood and affect; and was oriented times three. (Id.) Dr. Hardin recommended an MRI of Claimant's shoulder to evaluate for a possible rotator cuff tear; the results reflected left shoulder impingement. (Tr. at 374, 381) She also prescribed Mobic for pain and a trial of Lyrica for neuropathy. (Tr. at 374) Finally, Dr. Hardin referred Claimant to physical therapy for his back, but there are no such treatment notes in the record. (Id.) In June 2016, Claimant's examination remained unchanged. (Tr. at 378) Dr. Hardin switched Claimant from Lyrica to Cymbalta, because his insurance denied Lyrica. (Tr. at 376, 378)

When seen in August 2016, Claimant reported that Cymbalta helped with his depression, but not his restless legs. (Tr. at 381) With respect to his neck pain, Dr. Hardin noted that x-rays were unremarkable. (Tr. at 382) Claimant's examination remained the same and Dr. Hardin referred him for an orthopedic surgical consultation for his shoulder; for Claimant's neck symptoms, Dr. Hardin recommended topical capsaicin and a heating pad. (Id.)

During an October 2016 follow-up appointment, Dr. Hardin noted Claimant was seeing an orthopedist who was administering shoulder injections, which helped. (Tr. at 384) Dr. Hardin's treatment notes were inconsistent – at one point, she observed that Claimant ambulated with an irregular gait and a cane, but at another point, she documented that he had a normal gait with use of a cane. (Tr. at 384, 385) Dr. Hardin observed normal movement in all extremities with no edema, and normal hip range of motion. (Tr. at 385) Dr. Hardin also reviewed lumbar spine x-rays that

showed arthritic changes; for that, she added Flexeril and referred Claimant to physical therapy. (Id.) Dr. Hardin noted that cervical spine x-rays were normal. (Id.) A December 2016 treatment note again reflected inconsistent statements about Claimant's gait – Dr. Hardin noted in one place that he ambulated with an irregular gait and used a cane, but indicated elsewhere that he had a normal gait. (Tr. at 388) She prescribed samples of Voltaren gel and Amrix (another muscle relaxer) to help with osteoarthritic pain and muscle spasms. (Id.)

When seen in January 2017, Claimant reported that Voltaren gel, Flexeril, and ibuprofen helped his joint pain. (Tr. at 410) He also indicated that physical therapy was no longer providing him much relief. (Id.) Dr. Hardin refilled his medications and recommended continued physical therapy. (Tr. at 411) In February 2017, Claimant wanted to discuss depressive symptoms and stated he felt his pain was not improving. (Tr. at 414) Dr. Hardin's mental status examination revealed good judgment and a normal mood and affect. (Tr. at 415) Physically, Claimant had intact sensation and coordination, and normal motor strength bilaterally. (Id.) Dr. Hardin's assessment was that Claimant had failed physical therapy and NSAIDs. (Id.) She recommended that he proceed with an MRI of his shoulder, and she also prescribed Lexapro. (Id.)

Claimant followed up with Dr. Hardin in April 2017; Dr. Hardin noted that the MRI reflected no tears, although Claimant felt his pain had not changed, and reported that his depression had improved since he started medication. (Tr. at 419) Dr. Hardin's examination remained the same. (Id.)

In October 2017, Claimant presented to Amjad Medical Clinic to establish care with a new primary care provider. (Tr. at 421) His complaints included shoulder, neck, back, hip, and knee pain. (Id.) Ashley Fleenor, PA, observed Claimant had good judgment; a normal mood and affect;

and normal recent and remote memory. (Tr. at 422) Physically, Ms. Fleenor observed Claimant ambulating normally and she did not note that he used a cane. (Id.) In addition, although Claimant had reduced cervical spine, lumbar spine, and shoulder range of motion, he had normal motor strength and tone, a normal gait and station, and intact sensation and coordination. (Id.) Ms. Fleenor prescribed Mobic. (Id.)

Evidence Related to Mental Impairments:

In November 2015, Tonya McFadden, Ph.D., performed a consultative psychological evaluation at the state agency's request. (Tr. at 343-346) Dr. McFadden observed Claimant use a cane when he walked, "but he did not demonstrate any difficulties with ambulation." (Tr. at 343) Claimant reported being depressed because he could not work; however, he continued to engage in activities he enjoyed, such as cleaning the yard, caring for the plants, mowing the lawn, and raking leaves. (Tr. at 343-344) His daily activities included going outside to pick up tree branches; cleaning the house; doing laundry; going fishing and walking outside in nice weather; occasionally visiting friends; and shopping in the store about once per week. (Tr. at 344) He typically did not experience any anxiety or significant difficulties in public when alone, though he reported experiencing anxiety symptoms when he cannot find his girlfriend. (Id.) He reported he usually smoked marijuana daily. (Id.)

On mental status examination, Claimant appeared cooperative; had relevant and coherent speech with normal rhythm and tone; displayed no evidence of a distorted thought process, delusions, or hallucinations; described his mood as "easy-going"; had an appropriate affect; had fair judgment; had intact memory; and had normal concentration. (Tr. at 346) Dr. McFadden diagnosed an adjustment disorder with mixed anxiety and a depressed mood, and cannabis use.

13

(Id.) Based on the evaluation, Dr. McFadden opined that Claimant could perform simple and repetitive tasks without a great deal of difficulty; interact appropriately with co-workers and the public; and may have difficulty dealing with the usual stressors in competitive work due to adjustment reactions. (Id.)

In January 2016, at the initial level of administrative review, state agency psychologist Leslie Montgomery, Ph.D., reviewed Claimant's records and concluded that he did not have a severe mental impairment. (Tr. at 69) Dr. Montgomery noted that Claimant described a daily routine of caring for himself, housework, and yard work; he managed the grocery shopping in his household; he endorsed minimal symptoms of anxiety and his mood was described as "easy going"; he was cooperative; and he spoke with a normal rate and tone. (Id.) In April 2016, at the reconsideration level of review, Debra Lilly, Ph.D., reviewed Claimant's updated records and also concluded he did not have a severe mental impairment. (Tr. at 95) Dr. Lilly noted his allegations of worsening depression and anxiety, but he could follow written and spoken instructions well, he visited with his family weekly, and he had not sought any treatment for a mental health issue. (Id.)

Claimant's attorney referred him to L. Andrew Steward, Ph.D., in April 2016 for a consultative psychological evaluation. (Tr. at 357-364) Claimant described symptoms including nervousness, anxiety, memory and concentration difficulties, and depression "all of his life". (Tr. at 358-359) However, he had never been psychiatrically hospitalized, participated in any outpatient services, or used psychotropic medications. (Tr. at 359) Claimant said he spent a lot of his time outdoors working with flowers and cleaning his yard. (Id.) He liked to fish, was looking for a church, and had a few close friends. (Id.) On mental status examination, Claimant was casually dressed and appropriately talkative, and had a constricted affect and anxious and dysphoric mood;

14

no evidence of hallucinations, delusions, or paranoia; impoverished but not confused thought content and organization; and decreased fund of information, judgment, abstract reasoning, ability to perform calculations, attention, concentration, and memory. (Tr. at 358) Dr. Steward completed a "Medical Opinion Re: Ability to Do Work-Related Activities (Mental)" in which he indicated Claimant ranged from "seriously limited" to "no useful ability to function" in all work-related mental activities. (Tr. at 365-366) He also stated that Claimant "appear[s] permanently and totally disabled." (Tr. at 364)

Claimant presented to the emergency room in August 2017 complaining of pain and visual hallucinations. (Tr. at 432-433) The attending physician, Adam Miller, D.O., observed Claimant was alert with a normal mood and affect. (Tr. at 433) Dr. Miller admitted Claimant for treatment (Id.) During a consultation with Ahmad Eterm, M.D., Claimant described burning scrotal pain, "but he does not look at all in pain when I am talking to him." (Tr. at 436) Dr. Eterm believed Claimant "looks like he is acting out" – when he returned to check on him, Claimant was "completely comfortable he was reading a magazine and does not look in pain at all and he was asking if he can get something like morphine to help him feel better." (Id.) Dr. Eterm reviewed toxicology results that were positive for marijuana. (Tr. at 439) The hospital discharged Claimant. (Tr. at 441)

The next day, Claimant returned to the emergency room with his fiancée who stated he had worsening confusion and visual hallucinations. (Id.) Although Claimant appeared anxious and had flight of ideas and pressured speech, he was oriented to person, place, and time, he made good eye contact, and the attending physician, Kathleen Wides, M.D., did not observe any obvious evidence of active hallucinations. (Tr. at 442) In addition, Dr. Wides noted that Claimant told her upon

admission that he believed his issues were psychological, but he later stated he had other medical problems, not psychological ones, "in direct opposition of what he had told me earlier that he thought this was all emotional due to stresses from his family." (Tr. at 443) Dr. Wides reassured Claimant that his workup revealed no medical issues and discharged him home. (Id.)

In early September 2017, Claimant presented to Southern Highlands for an intake assessment for depression and anxiety symptoms. (Tr. at 446-451) Claimant arrived at the appointment with good hygiene and grooming, and he was dressed appropriately for the season and weather. (Tr. at 446) He used a cane for ambulation and described physical medical problems, but he denied having a primary care physician. (Tr. at 446-447) He stated he smoked marijuana "when he has the money," and last smoked it the previous evening. (Tr. at 448) On mental status examination, Claimant had an anxious mood, appeared overwhelmed, and was socially withdrawn, but he had coherent speech and rational thought content. (Id.) His recent and remote memory appeared impaired, and his insight and judgment appeared limited. (Id.)

The clinician scheduled Claimant for a psychiatric evaluation with Ted Webb, PA-C, the following week. (Tr. at 450) Claimant told Mr. Webb his doctors "stereotype him, and feel he wants drugs." (Tr. at 452) He last used marijuana that day. (Tr. at 453) On mental status examination, he appeared anxious and disheveled with limited cognition and memory, questionable insight/judgment, and borderline intelligence, but he had a stable mood, rational thought content, no delusions, normal speech, intact attention, and normal sociability. (Tr. at 455) Mr. Webb diagnosed unspecified depressive and anxiety disorders, post-traumatic stress disorder, and mild intellectual disabilities. (Id.) He prescribed Celexa, Trazodone, and Vistaril. (Tr. at 456)

In October 2017, Claimant presented to Mr. Webb for a medication check. (Tr. at 457) He had repetitive and pressured speech, a depressed, anxious, and irritable mood, and a broad and flat affect, but good insight and judgment, good memory, appropriate but vague thought content, normal stream of thought, and no hallucinations. (Id.) Mr. Webb adjusted his medications. (Tr. at 458)

**The Administrative Hearing**

Claimant Testimony:

Claimant confirmed he suffered a fracture to his right clavicle, a right knee crush injury and mental health issues. (Tr. at 39-40)

Claimant testified that the pain in his right clavicle/shoulder area was constant and rated it a 2; he is unable to reach overhead and can only reach as far as his shoulder, which is painful. (Tr. at 41-42) He indicated that his doctors have limited him to lifting and carrying with that arm to 20 to 30 pounds. (Tr. at 42) Claimant testified that he has constant pain in his back, rated it about a 2 or 3, but he has been unable to find a specialist to treat it. (Tr. at 43) He indicated his back prevents him from lifting and carrying any more than 20 pounds. (Id.) He also has constant pain in his right knee, rated it a 2 or 3, and his doctor prescribed him a cane; he uses his right hand for his cane in his right hand. (Tr. at 45)

To relieve his pain, he will sit in his recliner and put his feet up. (Tr. at 44) Certain activities makes his pain worse, such as driving, and he will try to stay off his feet as much as possible. (Tr. at 48)

Claimant testified he could walk about a football field before he needed to sit down. (Id.) He has problems combing his hair and brushing his teeth, getting dressed sometimes, but

sometimes he can do household chores, such as washing dishes, cooking simple meals, or laundry. (Tr. at 46)

Claimant testified that he suffers from depression because he is no longer the person he used to be and is not as active. (Tr. at 51) He has problems with his memory as well, where he forgets where he puts things, and needs his girlfriend to remind him to take his medication. (Tr. at 52) He testified that his pain causes him problems with his focus and concentration. (Id.) His pain also makes him not want to be around others. (Tr. at 52-53) His pain caused him to have a breakdown in late 2017. (Tr. at 53-54)

<u>Vocational Expert ("VE") Testimony:</u>

The ALJ asked the VE to assume an individual who could lift 20 pounds occasionally and 10 pounds frequently; stand and walk for 4 hours in an 8-hour workday; sit at least 6 hours in an 8-hour workday; never push or pull with the upper extremities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance and stoop; never kneel, crouch, or crawl; never use foot controls with the right lower extremity; never reach overhead; and occasionally tolerate exposure to temperature extremes, vibration, and hazards. (Tr. at 57-58) Mentally, the ALJ asked the VE to assume an individual who could understand, remember, and carry out simple, routine, repetitive tasks; respond appropriately to occasional interactions with co-workers and supervisors provided there was no team work or over-the-shoulder supervision; never interact with the general public; perform work that did not involve fast-paced production requirements; make few, if any, work-related decisions; and adjust to usual work situations and occasional changes in the routine work setting. (Tr. at 58)

The VE testified that someone with Claimant's vocational profile and RFC could perform work as a price marker, a postal mail clerk, and a laundry folder. (Tr. at 58-59) However, if the individual required the use of a cane in the right dominant hand for standing and walking, then the individual could not do work tasks at the light level. (Tr. at 59)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

<u>Determining Severe Impairment:</u>

Claimant has alleged the ALJ erred because she did not find he had a severe mental impairment, although the Appeals Council did in a subsequent review, presenting a question as to how the Appeals Council can adopt the ALJ's "paragraph B" findings as there is no other evidence in the record, save for Dr. Steward's opinion evidence. (ECF No. 14 at 10) A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. §§ 404.1522(b), 416.922(b). The Regulations provide examples of these activities:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) capacities for seeing, hearing, and speaking;
> (3) understanding, carrying out, and remembering simple instructions;
> (4) use of judgment;
> (5) responding appropriately to supervision, co-workers and usual work situations; and
> (6) dealing with changes in a routine work setting.

Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that he had an impairment (or combination of impairments) that had more than a minimal effect on his ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a); SSR 96-3, 1996 WL 374181. The impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant also bears the

burden of establishing a disabling impairment. See <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

There is no question that at step two, the ALJ made no express findings as to Claimant's mental impairments, whether severe or non-severe. (Tr. at 23-24) However, there is also no dispute that the ALJ found other severe physical impairments, and it is well known that there is no reversible error when an adjudicator fails to list all a claimant's severe impairments at step two so long as at least one severe impairment is found and that the adjudicator considers all severe impairments and limitations therefrom in the next steps in the sequential evaluation process. See <u>Lauver v. Astrue</u>, No. 2:08-cv-87, 2010 WL 1404767, at *4 (N.D.W.Va. Mar. 31, 2010).

Both parties acknowledge that the ALJ proceeded to the third step and with regard to Claimant's alleged mental impairments, performed the "special technique" pursuant to Sections 404.1520a and 416.920a, *supra*. (Tr. at 24-25; ECF No. 14 at 10 and ECF No. 17 at 19, n.3) In understanding, remembering, or applying information, the ALJ determined Claimant had a moderate limitation. (Tr. at 25) The ALJ based this finding on Claimant's Adult Function Report as well as records from Southern Highlands dated September 15, 2017 as well as "the record as a whole[.]" (Tr. at 25, 285, 288, 455)[3] In interacting with others, the ALJ found Claimant had a

---

[3] The ALJ noted Claimant stated in his Function Report that he did not need any special reminders to take care of his personal needs or to take medication, that he follows instructions well, and Southern Highlands records indicated that his memory was limited and poor.

moderate limitation, again, referencing Claimant's statements from his Adult Function Report and statements he made to Dr. McFadden during his consultative examination, in addition to the record as a whole. (Tr. at 25, 287, 289, 343-348)[4] In concentrating, persisting, or maintaining pace, the ALJ determined Claimant had a mild limitation, again referring to Claimant's statements in his Function Report and the report from Dr. McFadden and the record as a whole. (Tr. at 25, 288, 343, 346)[5] Finally, in adapting or managing oneself, the ALJ found Claimant had a moderate limitation, based on his Function Report, his hearing testimony and the record as a whole. (Tr. at 25, 284, 286)[6] Ultimately, the ALJ determined Claimant's mental impairments did not satisfy "paragraph B" criteria. (Tr. at 25)

Prior to step four, in the RFC assessment, the ALJ addressed Claimant's mental impairments again, noting that Dr. McFadden's December 11, 2015 records "show the presence of an adjustment disorder with mixed anxiety and depressed mood", again noting that she found his memory intact and his concentration within normal limits despite his allegations he had problems dealing with stress, his temper and not working. (Tr. at 28, 343, 346) Further, the ALJ acknowledged that Dr. McFadden noted Claimant had no history of inpatient or outpatient mental health treatment and that he "reported that he liked to stay outside, clean the yard, plant, mow, and rake leaves." (Tr. at 28, 344, 345)

---

[4] The ALJ noted Claimant's Function Report indicated he visited his family on a weekly basis, though denied going anywhere else on a regular basis, that he does not handle stress of changes in routine well and that he told Dr. McFadden that he goes to the store once a week and typically does not experience anxiety symptoms.

[5] The ALJ noted Claimant reported that he could only pay attention for about 5 minutes at a time, but he can finish what he starts, and that Dr. McFadden documented his concentration appeared within normal limits.

[6] The ALJ noted Claimant reported in his Function Report that he spends a typical day watching TV in pain, and that he testified he sometimes washes dishes and prepared his own meals, though he does not drive.

Next, the ALJ considered the psychological evaluation report from Dr. Steward dated April 26, 2016, assessing Claimant with major depressive disorder, generalized anxiety disorder, and "a learning disorder in written expression." (Tr. at 28) The ALJ noted Dr. Steward found Claimant's overall mental functioning in the borderline range based on his educational, employment, and behavioral history. (Tr. at 28, 364) Further, the ALJ noted that Dr. Steward found Claimant to be oriented in all spheres, but appeared to have depressed judgment, abstract reasoning, attention, concentration, and memory functions, and that Claimant reported to him that he "thought his memory was slipping", but had no suicidal thoughts, did not want to depend on others, and never had been on psychotropic medications. (Tr. at 28, 359)

The ALJ then considered the records from Southern Highlands when he was seen in September 2017 "for feelings of hostility and increased anxiety and depression" and that he appeared socially withdrawn, had impaired memory, limited insight, but had a fair prognosis. (Tr. at 28, 448, 455, 456) The ALJ also noted that treatment records from Dr. Amjad found Claimant had a normal memory and mood in November 2017. (Tr. at 28, 422)[7]

From this psychological evidence, the ALJ found that Claimant's alleged symptoms and limitations were not supported by the objective evidence, noting that he had no mental health treatment as of April 2016 and that while Dr. Steward found some deficits in his memory, attention, and concentration, the treatment records from Claimant's primary care physician "were devoid of any limitations due to mental health conditions." (Tr. at 28, 422) The ALJ further noted that Dr. McFadden found Claimant's memory intact and his concentration within normal limits (Tr. at 28,

---

[7] These records are from Amjad Medical Clinic, when Claimant sought a new primary care provider for his shoulder, neck, back, hip, and knee pain; these records are actually dated October 2017. (Tr. at 421-429)

343, 346); accordingly, the ALJ determined the record did not support a greater functional limitation than found within the RFC assessment. (Tr. at 28)

Clearly, the ALJ's consideration of the evidence as it related to Claimant's alleged mental impairments went well beyond the second step in the sequential evaluation process, therefore, the undersigned **FINDS** the ALJ's omission to include any severe mental impairments at step two is without error.

To the extent Claimant argues that the ALJ's "paragraph B" criteria findings are not based on substantial evidence, because it did not include Dr. Steward's opinion, it is clear that the ALJ examined the conflicting evidence of record and rendered a decision based on a reconciliation of the conflicting evidence. This Court has rejected any requirement that an ALJ is obligated to discuss every piece of evidence of record, but only to consider all of the evidence. See Goad v. Astrue, No. 06-00870, 2008 WL 644881, at *1 (S.D.W.Va. Mar. 7, 2008); Nisbet v. Colvin, No. 13-33047, 2015 WL 893010, at *17 (S.D.W.Va. Mar. 2, 2015); Bays v. Colvin, No. 14-1564, 2005 WL 769784, at *21 (S.D.W.Va. Feb. 23, 2015). Moreover, it is known that " 'an ALJ's failure to cite specific evidence does not indicate that it was not considered' " See Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016), " 'an ALJ's failure to cite specific evidence does not indicate that it was not considered.' " (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)). From the undersigned's review of the ALJ's discussion of the evidence as it related to Claimant's mental impairments, it is clear that the ALJ considered all the evidence, and ultimately determined that Claimant's mental impairments did not have a significant impact on his overall functioning precluding all work-related activities. Accordingly, the undersigned **FINDS** the ALJ's assessment of Claimant's mental impairments are supported by substantial evidence.

The Credibility Assessment:

Claimant has stated that the ALJ erred because she failed to explain how she found Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were inconsistent with the evidence of record; Claimant states this error is underscored by Dr. Parsley's opinion, which the ALJ gave "great weight", despite Dr. Parsley finding Claimant's subjective symptoms were consistent. (ECF No. 14 at 7, citing Tr. at 354)[8] In this case, the ALJ properly applied the two-step process espoused by Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), and then proceeded to review Claimant's subjective complaints, which included his testimony, and reconciled them with the medical evidence of record. (Tr. at 26-28) The ALJ is bound by Social Security Ruling ("SSR") 16-3p, which clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the consistency of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or

---

[8] Dr. Parsley noted: "The creditability of the claimant's symptoms and their functional affects seemed consistent with his statements, medical history and some of the objective findings during today's physical examination." (Tr. at 354)

psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

The ALJ began her analysis of Claimant's initial allegations that he is unable to work because of his leg problems, shoulder problems, and arm pain. (Tr. at 26, 263)[9] With respect to his physical impairments, the ALJ considered Claimant's testimony that he fractured his right clavicle and crushed his right knee in the past, and that he has pain in his right shoulder, "which is always there" and that "it is a dull pain (2 out of 10)." (Tr. at 26) The ALJ noted that Claimant testified his right knee was in constant pain, that he rated a 2-3 out of a 10-point scale and that he could lift up to 20 pounds, sit for 30-40 minutes at a time and can stand for about 20-30 minutes at a time. (Id.) The ALJ acknowledged that Claimant alleged he uses a cane. (Id.) Next, the ALJ considered Claimant's testimony that he had problems getting dressed and combing his hair at times, but he sometimes washes dishes and cooks meals. (Tr. at 26-27) Regarding his mental impairments, as

---

[9] The ALJ referenced Claimant's Disability Report dated September 1, 2015.

noted *supra*, the ALJ noted that despite Claimant's allegations to this extent, the evidence of record did not support a greater functional limitation than found in the RFC. (Tr. at 28)[10]

Next, the ALJ considered the medical evidence of record with respect to his physical impairments, noting that Claimant's "allegations of debilitating clavicle and right knee pain are inconsistent with imaging, physical examination findings, and the claimant's overall treatment history." (Tr. at 27) The ALJ recognized that although Claimant alleged knee surgery around 1992, an x-ray taken in October 2015 showed only mild narrowing and degenerative spurring, no evidence of effusion or visible soft tissue swelling, and Dr. Parsley observed Claimant had a normal gait and able to ambulate when standing without a cane, though he demonstrated decreased range of motion in the right knee. (Tr. at 27, 339, 354) Regarding his clavicle, the ALJ acknowledged Dr. Parsley noted he had probable right shoulder osteoarthritis, a history of two right clavicle fractures with and she observed a visual deformity, right shoulder crepitus, though she found Claimant's prognosis "with and without treatment was fair" and that he had not been prescribed any medication for joint pain and had a grip strength of 5/5 bilaterally. (Tr. at 27, 352, 354, 350, 352) The ALJ then noted that subsequent records from Bluefield Clinic Company showed Claimant had limited abduction in both shoulders and ambulated with a cane, although Amjad Medical Clinic records showed Claimant's gait and station were normal, and that he had some tenderness and limited range of motion in his shoulders, his sensation was grossly intact. (Tr. at 27, 370, 422)[11]

---

[10] The ALJ also considered the objective medical evidence of record as it related to Claimant's mental impairments, which the undersigned discussed *supra*, and need not be reproduced here.

[11] It is noted that the ALJ was comparing the medical records from the Bluefield Clinic Company dated March 29, 2016 with those from the Amjad Medical Clinic dated October 2017.

After her review of the medical evidence and other evidence of record, the ALJ found that the symptoms and limitations alleged by Claimant were not fully supported by the objective evidence, specifically noting that his physical conditions were treated conservatively since the alleged onset date and that specifically with respect to his right knee and shoulders complaints, "any limitations thereof have been adequately assessed in the established [RFC]." (Tr. at 27-28) Accordingly, the ALJ's credibility analysis did not offend Fourth Circuit jurisprudence, therefore, the undersigned **FINDS** that the ALJ's credibility assessment was supported by substantial evidence.[12]

Evaluation of Opinion Evidence:

As noted *supra*, Claimant contends the ALJ provided no explanation

Per §§ 404.1527(a)(1), 416.927(a)(1):

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh every medical opinion received into evidence, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation,

---

[12] To the extent that Claimant argues the ALJ's credibility analysis is erroneous where she did not recognize any severe mental impairments while the Appeals Council had (ECF No. 14 at 7), this argument lacks merit for the reasons stated *supra*: the ALJ **did** consider the limiting effects from Claimant's mental impairments in the steps beyond the second step of the sequential evaluation process and **did** recognize that his mental impairments caused him more limitations than assessed by the state agency consultants, both of whom found he had "no severe mental health impairments", as a result, the ALJ gave those opinions "little weight." (Tr. at 29) Claimant ostensibly advocates the proposition that this Court reweigh the conflicting evidence of record and substitute its own opinion in lieu of the ALJ's, which has long been deemed improper. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determination, or substitute our judgment for that of the [ALJ]."

(2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.

As an initial matter, to the extent that Claimant argued that the ALJ discounted Dr. Steward's opinion solely on the basis that it offered an opinion concerning Claimant's disability is without merit. (ECF No. 14 at 12) Medical opinions that a claimant is "disabled" or "unable to work" or as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. §§ 404.1527(d)(3), 416.927(d)(3). Indeed, the ALJ specifically noted that evidence from Claimant's primary treating physician and the consultative examiner were inconsistent with Dr. Steward's opinion, noting that Claimant "has a fair to good prognosis." (Tr. at 29, 346)

Further, to the extent that Claimant asserts the ALJ impermissibly discounted Dr. Steward's opinion with a blanket statement that it was inconsistent with the evidence of record without providing any explanation or specificity of the conflict (ECF No. 14 at 13), this argument is unavailing. As noted *supra*, the ALJ reviewed not only the findings documented in Dr. McFadden's psychological examination report (Tr. at 28), the ALJ acknowledged Dr. McFadden's opinion that Claimant had a "fair to good prognosis." (Tr. at 29, 346) Moreover, the ALJ noted the treatment records from Southern Highlands, which also documented Claimant's prognosis as

"fair"[13], as well as observed that Claimant's primary care physician also found his memory and mood normal around [October] 2017. (Tr. at 28, 456, 422)

To the extent that Claimant contends the ALJ substituted her own opinion in lieu of one provided by a psychological expert, namely, Dr. Steward (ECF No. 14 at 13), this argument lacks merit – not only does Claimant fail to specify how the ALJ substituted her own opinion, but this conclusory assertion is accompanied by no additional argument.[14] Moreover, to the extent Claimant argues that the ALJ improperly evaluated Dr. Steward's opinion, whose report consisted of the "only reports of psychological testing in the entire record and the report is unrebutted" (ECF No. 14 at 12), this argument also lacks merit. While it is accurate that Dr. Steward's psychological evaluation report contains the only tests[15] administered in the record, obviously, as demonstrated by the ALJ throughout the written decision, his conclusions and findings are not "unrebutted".

Though Claimant asserted that the ALJ's evaluation of the opinion evidence was deficient because she did not address the factors set forth in Sections 404.1527 and 416.927 (ECF No. 14 at 7-8), *supra*, this District has recognized that the ALJ is not required to recount the details of her analysis of medical opinions. Tucker v. Astrue, 897 F.Supp.2d 448, 468 (S.D.W.Va. Sept. 27, 2012) (Eifert, M.J.) (ECF No. 12 at 15) It is notable that there are no treating physician opinions of record, and further, the ALJ specifically noted the lack of consistency with the overall record of

---

[13] It is noted that the mental health record from Southern Highlands cited by the ALJ is dated September 15, 2017. The record contains no other mental health treatment records except for those dated September 2017 to October 2017 since Claimant's alleged onset date.

[14] Given the lack of any additional argument supporting this position, Claimant has waived any argument on this specific issue. Grayson O Company v. Agadir International LLC, 856 F.3d 307, 316 (4th Cir. 2017).

[15] Those tests are: Weschler Adult Intelligence Scale – IV (WAIS-IV); Wide Range Achievement Test – 4 (WRAT-4); Mini Mental Status Exam (MMSE); Beck Anxiety Inventory (BAI); Beck Depression Inventory-II (BDI-II); and Personality Assessment Inventory (PAI). (Tr. at 357)

evidence for those opinions of record (i.e. from the state agency psychological consultants and Dr. Steward) that did not warrant any enhanced treatment as provided under the Regulations' enumerated factors. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion."). Additionally, the fact that the ALJ acknowledged that Dr. Steward provided a psychological evaluation report dated April 26, 2016 indicates that the ALJ had an appreciation for his opinion as a one-time examiner.

Finally, to the extent that Claimant has questioned the inconsistencies between the ALJ's evaluations and the Appeals Council's evaluation of the opinion evidence (ECF No. 14 at 8-9), Claimant ostensibly advocates the proposition that this Court reweigh the conflicting evidence of record and substitute its own opinion in lieu of the Commissioner's, which has long been deemed improper. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determination, or substitute our judgment for that of the Secretary." In short, the ALJ has discharged her duty pursuant to Sections 404.1527(c) and 416.927(c) and provided an adequate explanation for her conclusions that allows for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

Accordingly, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence complies with the Regulations and with this Circuit's jurisprudence, and is therefore not erroneous. Additionally, the undersigned further FINDS that the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

<u>The RFC Assessment:</u>

Claimant has simply stated that the RFC assessment is "fatally flawed" and the Appeals Council's acceptance of the RFC "merely compounded the error." (ECF No. 14 at 9) Given the lack of any additional argument supporting this position, Claimant has waived any argument on this specific issue. <u>Grayson O Company v. Agadir International LLC</u>, 856 F.3d 307, 316 (4th Cir. 2017).

Nevertheless, the RFC assessment represents the *most* that an individual can do despite his imitations or restrictions. <u>See</u> SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. <u>See</u> <u>Id</u>. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted *supra*, the ALJ compared Claimant's statements and testimony concerning his alleged disabling conditions with the objective and other evidence of record, and ultimately determined that the evidence simply did not support Claimant's allegations that he was so limited that all substantial gainful activity was precluded. Because only the ALJ is tasked with determining the particular facts in a case and to resolve the inconsistencies therein, and as stated *supra*, this

Court does not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 at 589. Indeed, the ALJ explicitly considered the assessments provided by the state agency medical consultants, both of whom determined that Claimant could perform work at the light exertional level with additional postural, manipulative, and environmental limitations. (Tr. at 29, 63-74, 75-86, 89-101, 102-114) The ALJ found their opinions were consistent with the conservative treatment record since the alleged onset date "and that [Claimant] is able to ambulate without a cane[]", and gave them great weight. (Tr. at 29, 339)[16]

Claimant has also argued that the ALJ's RFC assessment is flawed because it does not include his cane use. (ECF No. 14 at 11-12) The SSA issued SSR 96-9p providing further guidance when the issue of hand-held assistive devices arises:

> **Medically required hand-held assistive device:** To find that a hand-held assistive device is medically required, *there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed* (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

See, *Titles II and XVI: Determining Capability to do Other Work--Implications of a Residual Functional Capacity For Less Than a Full Range of Sedentary Work*, SSR 96-9p, 1996 WL 374185, at *7. (**bold** in original; emphasis supplied) Earlier in the written decision, the ALJ determined that Claimant's impairments failed to meet the listing for 1.02 (major dysfunction of a joint), explicitly noting that the evidence did not demonstrate any inability to ambulate effectively. (Tr. at 24) Later in the written decision, the ALJ acknowledged Claimant's testimony that he uses

---

[16] The ALJ referenced the right knee x-rays taken on October 28, 2015 which documented "no more than mild narrowing and degenerative spurring." (Tr. at 339)

a cane. (Tr. at 26) The ALJ then considered the consultative examination report from Dr. Parsley who noted Claimant "had a normal gait and was able to ambulate when standing in the examination room without a cane, despite some noted decreased range of motion in the right knee." (Tr. at 27, 354) The ALJ also considered the records from Bluefield Clinic Company, which also documented that Claimant "ambulated with a cane", but Amjad Medical Clinic records showed his "gait and station were normal[.]" (Tr. at 27, 28, 370, 422)

There are no medical treatment notes in the record that indicate Claimant's cane was medically required as defined by the SSA, *supra*. Moreover, it is important to appreciate this Circuit's recognition that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As discussed above, the ALJ evaluated the evidence with respect to Claimant's allegation that he was totally disabled by his physical as well as his mental impairments, and found them to be inconsistent with the overall record. Thus, the ALJ did not err by not including Claimant's cane use in the RFC assessment.

The ALJ explicitly noted that the vocational expert testified that an individual with Claimant's vocational background, age, and education and limited to light work with the aforementioned postural and environmental restrictions could still perform other jobs in the national economy. (Tr. at 30) To the extent Claimant argues that his cane use would preclude even sedentary work (ECF No. 14 at 12), once again, Claimant's contention is akin to a request that this Court should re-weigh the evidence, however, any conflicts within the evidence of record, as stated *supra*, is for the ALJ to resolve, not this Court. See also, SSR 96-8p, 1996 WL 3741784, at *7.

Because the ALJ is only required to incorporate those limitations established by the record,

the undersigned **FINDS** the ALJ's RFC assessment is supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (ECF No. 13), **GRANT** the Defendant's request to affirm the decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933

(1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 6, 2020.



Omar J. Aboulhosn
United States Magistrate Judge